AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| United States of America | |
|---|---|
| v. | Case No. 2:24-mj-01756 |
| TREVON NATHANIEL LANGSTAFF, | |
| Defendant(s) | |

FILED
CLERK, U.S. DISTRICT COURT
3/27/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 26, 2024, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 18 U.S.C. § 2423(a) | Transportation of a Minor with Intent to Engage in Criminal Sexual Activity |

This criminal complaint is based on these facts:

   *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Matthew Parker, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 3/27/24

Judge's signature

City and state: Los Angeles, California

Hon. Charles Eick, U.S. Magistrate Judge
Printed name and title

AUSA:   D. Diaz x0302

**AFFIDAVIT**

I, Matthew Parker, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation (the "FBI"), and have been so employed since February 2001. I have been assigned to several types of squads over the course of my career, including squads responsible for the investigation of organized crime groups and violent crimes. I am currently assigned to the Violent Crimes Squad and the Long Beach Resident Agency. As a Special Agent, I have participated in numerous federal and state investigations involving violent crimes, extortion, child exploitation, kidnapping, rape, murder, and murder-for-hire. Through my participation in these investigations, I have debriefed numerous defendants, cooperating sources, and witnesses with personal knowledge regarding various violent crimes.

2. I am familiar with the facts and circumstances described herein, and this affidavit is based upon my own knowledge, as well as statements and documents provided by witnesses, and other records obtained from other sources, and information gathered and analysis conducted by other law enforcement agents and investigators.

## II. PURPOSE OF AFFIDAVIT

3. This affidavit is made in support of a criminal complaint against, TREVON NATHANIEL LANGSTAFF ("LANGSTAFF") for

a violation of 18 U.S.C. § 2423(a), Transportation of a Minor with Intent to Engage in Criminal Sexual Activity.

4. This affidavit is also made in support of a search warrant for 3510 Hathaway #222, Long Beach, California 90815 (the "SUBJECT PREMISES") described in Attachment A-1, for the items to be seized described in Attachment B.

5. This affidavit is also made in support of a search warrant for a Silver Nissan Sentra SR Turbo, bearing license plate 7ZNR121 and VIN 3N1CB7AP8HY327309, registered to LANGSTAFF at the SUBJECT PREMISES (the "SUBJECT VEHICLE") described in Attachment A-2, for the items to be seized described in Attachment B.

6. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

### III. PROPERTY TO BE SEARCHED

7. The premises to be searched is the SUBJECT PREMISES described in Attachment A-1, which is incorporated herein by reference.

8. The vehicle to be searched is the SUBJECT VEHICLE described in Attachment A-2, which is incorporated herein by reference.

## IV. ITEMS TO BE SEIZED

9. The items to be seized are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252A (Production/Receipt/Distribution/Possession of Child Pornography), 2422 (Coercion and Enticement), 2423(a) (Transportation of a Minor with Intent to Engage in Criminal Sexual Activity), and 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct) (the "Subject Offenses"), as described in Attachment B, which is incorporated herein by reference.

## V. SUMMARY OF PROBABLE CAUSE

10. On March 26, 2024, LANGSTAFF traveled across state lines in the SUBJECT VEHICLE, from Arizona to California, with Victim 1, a 14-year-old girl, with the intent to engage in criminal sexual activity. LANGSTAFF engaged in criminal sexual activity with Victim 1 at the SUBJECT PREMISES, where law enforcement found and rescued Victim 1 and arrested LANGSTAFF.

## VI. STATEMENT OF PROBABLE CAUSE

### A. Victim 1 Goes Missing From Peoria, Arizona

11. On March 26, 2024, FBI Long Beach received information from FBI Phoenix, Arizona, regarding a report of a missing 14-year-old female ("Victim 1") who ran away from a residence in Peoria, Arizona.

12. Based on my discussions with Peoria Police Department ("PPD") Detective Gretel Hopkins, I know the following:

      a. Victim 1 and her guardian were visiting and staying with family in Peoria, Arizona.

      b. On March 26, 2024, in the early morning, Victim 1's family discovered she was missing from the residence where they were staying, and the back door was unlocked.

      c. Victim 1's family searched for her in the neighborhood, and contacted Victim 1's friend to see if the friend had any information on Victim 1's whereabouts.

      d. Victim 1's friend said that one week ago, Victim 1 told the friend she was planning to run away from home. Victim 1 told the friend she had met a man who who harbored runaways and who currently had two other minor teens staying with him. The man told Victim 1 he would give her a cell phone and a room to stay in.

      e. On March 26, 2024, at approximately 9:38 a.m., Victim 1's guardian contacted PPD to report that Victim 1 was missing.

      f. Home surveillance footage from the morning of March 26, 2024 depicts Victim 1 leaving her family's property by jumping over a fence and entering a silver sedan matching the description of the SUBJECT VEHICLE.

  **B. PPD Identifies LANGSTAFF**

      a. PPD served exigent requests to T Mobile, the carrier for Victim 1's cell phone, for call detail records. The call detail records reveal hundreds of contacts between Victim 1 and phone number (602) 654-5006 between March 24, 2024 and March 26, 2024.

      b.    (602) 654-5006 is a telephone number issued by TextNow, a Voice over Internet Protocol (VoIP) service that allows users to text and call any number in the United States and Canada when connected to WiFi at no cost.

      c.    TextNow provided the following IP Addresses associated with (602) 654-5006 from March 22, 2024 to March 26, 2024: 96.41.66.123 ("Suspect IP Address"), owned by Spectrum.

      d.    Spectrum provided the following subscriber information for the Suspect IP Address for the dates March 26, 2024:

        i.    Subscriber Name: TREVON LANGSTAFF

        ii.    Service Address: 3510 Hathaway #222, Long Beach, California 90815 (the "SUBJECT PREMISES")

        iii. Phone Number:  (562) 313-7055

      e.    (562) 313-7055 is a telephone number issued by Verizon, and subscribed to LANGSTAFF at the SUBJECT PREMISES ("LANGSTAFF's Phone").

      f.    PPD obtained a cell-site warrant for LANGSTAFF's Phone, which revealed that between March 25 and 26, 2024, LANGSTAFF's Phone traveled from the Long Beach, California area to Peoria, Arizona in the vicinity of Victim 1's family's residence, and back to Long Beach, California.

      g.    Since approximately 9:11 a.m. on March 26, 2024, LANGSTAFF's Phone was located at or near the SUBJECT PREMISES.

    **C.**    **FBI Locates Victim 1 at the SUBJECT PREMISES**

    13.    On March 26, 2024, at approximately 11:30 p.m., I along with other special agents from the FBI and local law

enforcement officers responded to the SUBJECT PREMISES in order to attempt to locate and rescue Victim 1. At the open rear window to the SUBJECT PREMISES, agents and officers could hear a male and a female voices.

14. On March 27, 2024, at approximately 12:50 a.m., agents knocked on the door of the SUBJECT PREMISES. LANGSTAFF opened the door and agents entered the SUBJECT PREMISES. Victim 1 was found hidden in a closet.

15. FBI agents have secured the SUBJECT PREMISES and are awaiting the issuance of a federal search warrant before searching the premises.

**D.   Interview with LANGSTAFF**

16. On March 27, 2024, at approximately 1:15 a.m., LANGSTAFF was interviewed by myself, Special Agent James Yun, and Supervisory Special Agent Adam Smith. Among other things, LANGSTAFF stated:

   a.   Upon entry in to SUBJECT PREMISES, LANGSTAFF stated that there was no one else in the residence with him. Victim 1 was soon found hiding in the closet.

   b.   LANGSTAFF met VICTIM 1 through an online chat forum named "reddit." The subreddit forum was themed around runaways. LANGSTAFF communicated with VICTIM 1 regarding his travel from California to Arizona to pick up VICTIM 1 and bring her back to the SUBJECT PREMISES in California.

   c.   LANGSTAFF travelled from California to Arizona in the SUBJECT VEHICLE. LANGSTAFFF drove VICTIM 1 from Arizona to California to the SUBJECT PREMISES.

   d. LANGSTAFF repeatedly said he was sorry for what he had done but did not offer any details.  LANGSTAFF first stated that he was intending to take VICTIM 1 to Hollywood to get discovered then changed the reason and stated he was going to take her to a homeless shelter in Los Angeles.

   e. LANGSTAFF stated that he did not have sex with VICTIM 1.

  17. LANGSTAFF was arrested by the FBI for pending the issuance of a federal complaint.

  **E.** **Interview with Victim 1**

  18. On March 27, 2024, at approximately 1:30 a.m., Victim 1 was interviewed by FBI Special Agents Elizabeth Cardenas and Dominick Canty, who reported that Victim 1 made the following statements, among others:

   a. Victim 1 met LANGSTAFF after she posted on an internet forum named "reddit" and sub labeled "Runaways" her intention to run away from home.  Victim 1 told LANGSTAFF that she was 14 years old.

   b. Victim 1 and LANGSTAFF made plans for LANGSTAFF to drive to Arizona to pick her up and transport her to California to live with him.

   c. LANGSTAFF asked Victim 1 to send him nude pictures, but Victim 1 did not comply.

   d. LANGSTAFF told Victim 1 he wanted to have sex in the car on the drive from Arizona to California, but Victim 1 wanted to wait.

      e.    Victim 1 and LANGSTAFF had sexual intercourse three times at the SUBJECT PREMISES since her arrival in California.

    **F.    The SUBJECT VEHICLE Belongs to LANGSTAFF**

    19.    The SUBJECT VEHICLE is registered to LANGSTAFF at the SUBJECT PREMISES.

    20.    The SUBJECT VEHICLE matches the description of the vehicle that Victim 1 entered after she left her family's home in Peoria, Arizona.

    **G.    LANGSTAFF's Criminal History**

    21.    Based on my review of LANGSTAFF's criminal history, I learned that LANGSTAFF was convicted of Battery on or about February 2, 2021.

### VII. TRAINING AND EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

    22.    Based the facts set forth above, and my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, there is probable cause to believe that LANGSTAFF has a sexual interest in children and images of children.  Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to such individuals:

      a.    Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or

from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity.  These individuals often maintain possession of these items for long periods of time and keep their collections in numerous places – in digital devices in their homes, in their cars, in their workplaces, or on their persons.

        b.    Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials (including through digital distribution via the Internet); conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.  These individuals often maintain possession of these items for long periods of time.

    23.  Digital child pornography on a digital device is easy to maintain for long periods of time.  Modern digital devices often have extremely large storage capacities.  Furthermore, cheap and readily available storage devices, such as thumb drives, external hard drives, and compact discs make it simple for individuals with a sexual interest in children to download child pornography from the Internet and save it – simply and securely – so it can be accessed or viewed indefinitely.

24. Furthermore, even if a person deleted any images of child pornography that may have been possessed or distributed, there is still probable cause to believe that there will be evidence of the illegal activities – that is, the possession, receipt, distribution, and/or production of child pornography, enticement and/or attempted enticement – on the digital devices. Based on my training and experience, as well as my conversations with digital forensic experts, I know that remnants of such files can be recovered months or years after they have been deleted from a digital device.  Evidence that child pornography files were produced, uploaded, downloaded and viewed can also be recovered, even after the files themselves have been deleted, using forensic tools.  Because remnants of the production, possession, distribution, and viewing of child pornography is recoverable after long periods of time, searching the digital devices could lead to evidence of the child exploitation offenses.

VIII.     **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**[1]

25. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

11

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

26.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      e.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

f. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

27. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

g. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

h. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an

13

enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

      i.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress LANGSTAFF's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of LANGSTAFF's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

28.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. AUTHORIZATION FOR NIGHT SERVICE

29.   This affidavit also seeks authorization for night service in order to prevent any destruction of evidence.  FBI agents are at the SUBJECT PREMISES to prevent anyone from entering to destroy evidence.

## X.   CONCLUSION

30.   For all the reasons described above, there is probable cause to believe that TREVON NATHANIEL LANGSTAFF violated 18 U.S.C. § 2423(a), Transportation of a Minor with Intent to Engage in Criminal Sexual Activity.

31.   Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at the SUBJECT PREMISES and in the SUBJECT VEHICLE, as described in Attachments A-1 and A-2.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 27th day of March, 2024.

_____
UNITED STATES MAGISTRATE JUDGE